## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:23-cr-65 (ABJ)** |
| **v.** | : | |
| | : | |
| **ALAN SCOTT CULBERTSON,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Alan Scott Culbertson to 36 months of probation with a special condition of 30 days of home detention and the mandatory $10 special assessment. The government also requests that this Court impose 50 hours of community service and, consistent with the plea agreement in this case, $500 in restitution.

### I.      Introduction

Defendant Alan Scott Culbertson—a 60-year-old, self-employed residential and commercial painter who lives near Greenville, South Carolina—participated in the January 6, 2021, attack on the United States Capitol, a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] The Plea Agreement in this matter, filed on July 31, 2023 (ECF No. 12 at ¶ 12), states that the riot caused approximately $2,881,360.20 in damage to the United States Capitol. That amount has since increased. As of July 7, 2023, the approximate losses suffered as a result of the siege at the

Culbertson pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G) (Unlawful Parading, Demonstrating, or Picketing in the Capitol Building). The government's recommendation is supported because Culbertson (1) entered the Capitol through the Senate Wing Door while alarms blared and other rioters were entering the building through smashed out windows adjacent to that door; (2) traveled to Statuary Hall and the Rotunda; (3) saw broken windows and multiple uniformed and armed police officers along the way; (4) posed for photographs and took photographs of other rioters; (5) observed violent clashes between rioters and police officers; (6) remained inside the Capitol for approximately 35 minutes; (7) only exited when forced to do so by police officers; and (8) expressed, at best, minimal remorse for his conduct during his two interviews with FBI agents.

The Court must also consider that Culbertson's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts of and circumstances of Culbertson's crime support a sentence of 36 months of probation with a condition of 30 days of home detention, 50 hours of community service, $500 in restitution, and the mandatory $10 special assessment.

---

United States Capitol were $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.        Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary background exposition, the government refers the Court to the general summary of the attack on the U.S. Capitol contained in the Statement of Offense. ECF No. 13 at 1-3.

### *Culbertson's Role in the January 6, 2021, Attack on the Capitol*

In early January 2021, Culbertson traveled together with his friends William and Joei Gallman[2] from South Carolina to Washington, D.C. to attend rallies in support of former President Donald Trump. On January 6, 2021, Culbertson and the Gallmans ("the trio") attended former President Trump's rally on the Ellipse together. Around that time, they posed for the photograph below.



*Image 1: (from left to right) Culbertson, Joei Gallman, and William Gallman near the rally*

---

[2] The Gallmans were prosecuted together, but separately from Culbertson, in case number 1:23-cr-48 (ABJ). Like Culbertson, both Gallmans pleaded guilty via plea agreement to one count of violating 40 U.S.C. § 5104(e)(2)(G) (Unlawful Parading, Demonstrating, or Picketing in the Capitol Building). They were each sentenced to 18 months of probation, a fine of $1,000, and $500 in restitution. Also, the Gallmans were each required to complete 50 hours of community service. *Id.*, Minute Orders of 8/21/23.

The trio then marched to the U.S. Capitol and joined the mob that proceeded en masse to the U.S. Capitol's West Plaza, where they observed rioters inside the restricted area physically battling police officers amidst clouds of tear gas. The trio watched the chaos but it did not deter them. Instead, they pressed forward, following the mob up the exterior stairs to the second level of the U.S. Capitol building, known as the Upper West Terrace. There, William Gallman used his cell phone to take photographs and video of the mob overrunning the police and storming the Capitol building while Culbertson and Joei Gallman watched the chaos unfold. *See* Image 2.



*Image 2: William Gallman using his cell phone to take video and/or photographs on the Upper West Terrace as rioters overrun police, while Joei Gallman and Culbertson observe the chaos*

At approximately 2:13 p.m., rioters used a stolen police riot shield and other objects to smash the windows on either side of the Capitol building's Senate Wing Doors. With the windows shattered, rioters breached the Capitol building for the first time by jumping through the windows over the broken glass. *See* Image 3.



*Image 3: At 2:13 p.m., rioters break into and enter the Capitol building through the windows adjacent to the Senate Wing Door*

At approximately 2:20 p.m.—just seven minutes after the initial unlawful rioter entry depicted above—the trio entered the U.S. Capitol building through the same Senate Wing Door. The Gallmans entered first, and just moments later, Culbertson entered the Capitol building through the same door and rejoined the Gallmans inside. At the time the trio entered the U.S. Capitol building, an alarm was sounding, other rioters were climbing into the building through broken windows on either side of the Senate Wing Door, and at least one of the windows of the Senate Wing Door itself was broken. The moment Culbertson entered the Capitol is depicted below. *See* Image 4.



*Image 4: At 2:20 p.m., Culbertson (indicated with red arrow) entered the Capitol building through the Senate Wing Door*

Over the next 35 minutes, Culbertson walked throughout the U.S. Capitol building. Along the way, he observed many uniformed and armed police officers, experienced the crush of the crowd in the hallways, and saw rioters in physical conflict with police officers. Throughout his time in the Capitol building, he took photographs and recorded videos of other rioters.

From the Senate Wing Door, Culbertson walked down a hallway, following the crowd of invading rioters. The hallway led to the Crypt, which by that point was full of rioters whose progress had been blocked by a small group of police officers. Culbertson and the Gallmans, who were far from the front line of rioters confronting the line of police officers, were temporarily stymied by the bottleneck that formed. After only a few minutes, however, rioters broke through the police line and walked up the stairs leading to the Capitol's third level. Culbertson followed

the crowd up the stairs, finding himself in Statuary Hall, which he walked through with the Gallmans, using his phone to capture what he saw. *See* Image 5.



*Image 5: Culbertson (yellow box) and the Gallmans walking through Statuary Hall as Joei Gallman displays an image on her cell phone*

After leaving Statuary Hall, Culbertson walked, pressed body-to-body with other rioters, down a crowded hallway leading to the Rotunda. *See* Image 6.



*Image 6: Culbertson and the Gallmans (boxed in yellow) pressed body-to-body with other rioters in a Capitol hallway after leaving Statuary Hall*

Culbertson spent several minutes in the Rotunda, mostly taking photographs with his cell phone. *See* Image 7.



*Image 7: William Gallman and Culbertson (vertical red arrows) taking photographs in the Rotunda while Joei Gallman (horizontal red arrow) looks on*

At approximately 2:54 p.m., Culbertson was standing in a hallway adjacent to the Rotunda when a reinforcement group of uniformed police officers wearing riot gear and neon yellow jackets entered the hallway. He stood to the side to let the procession of officers walk past him. When the group of new officers reached the end of the hallway farthest from the Capitol's exterior door (the innermost point of the hallway), the officers turned around and executed an organized group maneuver to clear the rioters from the hallway and force them out of the building. Specifically, the officers—now facing the rioters and the exit—raised their batons parallel to the floor and began shouting in unison, "Move back! Move back!" The group of officers then steadily walked forward, toward the building exit, forcing the unlawfully occupying mob to move in that direction. The officers pushed resistant rioters in the back with the sides of their batons. William Gallman and

Culbertson did not immediately leave the hallway, and thus Culbertson and William Gallman were among the slow-moving rioters pushed in the back by the police, but they do not appear to have physically resisted the officers. *See* Image 8.[3]



*Image 8: William Gallman and Culbertson being pushed by police working to clear the hallway outside the Rotunda*

Meanwhile, Joei Gallman was standing against a nearby wall, having become separated from her husband and Culbertson. The trio reunited just before the building's exit.

Ultimately, the officers succeeded in forcing the rioters gathered in that hallway—including the Gallmans and Culbertson—to exit the building. The trio finally exited the Capitol building at approximately 2:55 p.m. through a door on the eastern side of the building, approximately 35 minutes after they had entered.

---

[3] Image 8 is a screenshot from a MPD officer's body worn camera video. That video is publicly available at https://propublica-data-j6cases-videos.s3.us-east-1.amazonaws.com/b7a6b0c01e75013acc422cde48001122.mp4?_ga=2.33327806.1204253088.1638647062-233311640.1635534856 (last accessed August 14, 2023).



*Image 9: Culbertson and the Gallmans (red arrows, from left to right) conferring near the magnetometer just before exiting the Capitol building*



*Image 10: Police forcing Culbertson (red arrow) and the Gallmans (yellow box) to leave the Capitol building*

As he acknowledged in the Statement of Offense supporting his plea, Culbertson was aware that the Senate intended to tally the Electoral College votes, and thus certify the 2020 presidential election of Joseph R. Biden, on January 6, 2021, the same day that he entered and participated in the occupation of the Capitol building. *See* ECF No. 13. Culbertson has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and that he engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress. *See id.*

*Culbertson's FBI Interviews*

FBI agents conducted two voluntary interviews of Culbertson. He admitted to all of the conduct described above, including unlawfully entering the Capitol building on January 6, 2021, and identified himself in photographs. He expressed minimal remorse, however. He stated that he believed that he had not done anything wrong and was right to be there standing up for his president. He expressed that the riot at the Capitol "felt like a set up" and blamed the Capitol police officers for allowing his unlawful entry into the building. Specifically, Culbertson stated that if the police did not want anyone to go inside the building, they would have prevented people from doing so, in spite of the facts that he had observed many uniformed and armed police officers, experienced the crush of the crowd in the hallways, and saw rioters in physical conflict with police officers. Instead, Culbertson claimed that five police officers stood still as he entered the Capitol building, so he thought his entry was allowed, in spite of the facts that an alarm was sounding, other rioters were climbing into the building through broken windows on either side of the Senate Wing Door, and at least one of the windows of the Senate Wing Door itself was broken.

Nevertheless, Culbertson acknowledged that he should not have entered the Capitol building and that once inside, an officer told him he was not allowed up the stairs to use the

restroom but that he remained in the building anyway. Culbertson admitted that though he thought he was there to do the right thing, he should have run when he observed the mob getting increasingly aggressive. In his second meeting with FBI agents, Culbertson allowed agents to examine and photograph clothing he wore during the riot on January 6.

*The Charges and Plea Agreement*

On March 1, 2023, the United States charged Culbertson via a one-count Information with violating 40 U.S.C. § 5104(e)(2)(G). ECF No. 5. On July 31, 2023, pursuant to a plea agreement, Culbertson pleaded guilty to the charge in the Information. *See* Minute Entry 7/31/23; ECF Nos. 11-14. As part of his plea agreement, Culbertson agreed to pay $500 in restitution to the Architect of the Capitol. ECF No. 12.

## III.      Statutory Penalties

Culbertson now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Culbertson faces up to six months of imprisonment and a fine of up to $5,000. Culbertson must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As his offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 36 months of probation with a special condition of 30 days of home detention, 50 hours of community service, $500 in restitution, and the mandatory $10 special assessment.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Culbertson's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for misdemeanor defendants like Culbertson, the absence of violent or destructive acts is not a mitigating factor. Had Culbertson engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Culbertson's case is the fact that he entered the Capitol building through the Senate Wing Door just seven minutes after it was first breached, making him part of the initial wave of rioters that quickly overwhelmed police officers and provided the rioters with nearly unfettered access to the Capitol's chambers, offices, hallways, and other sensitive areas. He then roamed the Capitol for approximately 35 minutes, only leaving when police officers physically forced him to exit. While he did not wear tactical gear or engage in violence, the true strength of the rioters was in the mob's sheer numbers, and he added to that power. Moreover, although Culbertson voluntarily participated in interviews with FBI agents, he expressed minimal remorse for his conduct. He still believes he did the right thing, was supporting "his president," and was misled or induced to commit a crime by the U.S. Capitol Police officers who did not stop him from entering the Capitol building.

### B. Culbertson's History and Characteristics

Prior to his conduct on January 6, 2021, Culbertson generally appears to have led a productive, law-abiding life, other than three incidents:

1. In 1991, he earned a DUI conviction, for which he received a fine, PSR ¶ 25;

2. In 2007, he earned a Reckless Driving conviction, for which he also received a fine, *id.* ¶ 26;

3. In 2022, a motorcycle accident caused serious injuries to Culbertson's spine, neck, face, and elbow. *Id.* ¶¶ 40-41. Culbertson's daughter reported that the accident resulted from Culbertson's driving his motorcycle while intoxicated. *Id.* ¶ 47. The incident did not lead to criminal charges, however.

The defendant works as professional residential and commercial painter, though his income is low enough that he qualifies for SNAP benefits.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.") Thus, under this factor, these cases should not "start off . . . with any presumption of probation." *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Culbertson's actions during the riot and his minimal showing of remorse demonstrate the need for specific deterrence. He has given no indication that he would not make the same choices if a similar situation arose. Indeed, while Culbertson told the FBI agents that he should have run when the crowd became aggressive, this pales in comparison to his statements that he went to the Capitol to "do the right thing," that he still does not feel like he did anything wrong, and that it was the U.S. Capitol Police's fault, not his, that he unlawfully entered the building. With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media

and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms. The Court must sentence Culbertson in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Culbertson based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Culbertson has pleaded guilty to Count One of the Information, charging him with Unlawful Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The Gallmans' cases are obvious comparators to this case, given that their conduct on January 6 was nearly identical to Culbertson's conduct. But there are two key differences between the Gallmans' cases and Culbertson's case. First, the Gallmans consistently expressed genuine remorse. Second, the Gallmans ran a successful small business, so a fine presented a reasonable punishment. As part of their respective sentences, the Court ordered William and Joei Gallman to each pay a $1,000 fine, in addition to imposing 18 months of probation.[5]

Here, in contrast, Culbertson has not been consistently and genuinely remorseful. Thus, unlike the Gallmans, there is a heightened need for specific deterrence as to Culbertson. Moreover, Culbertson cannot afford to pay a fine. *See* PSR ¶¶ 55-63. Accordingly, it would be appropriate for the Court to impose a stiffer sentence, in terms of the length and conditions of probation, compared to the sentence imposed against the Gallmans.

Two additional cases provide a close match to the most salient aspects of this case: *United States v. Lattanzi*, 1:22-cr-28 (TSC), and *United States v. Ferreira*, 1:22-cr-210 (TSC). In both cases, Judge Chutkan sentenced the defendants—who pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G), the same charge as Culbertson—to 14 days of incarceration and $500 in restitution.

Like Culbertson, Nicholas Lattanzi entered the U.S. Capitol building through the Senate Wing Door, although he did so at 3:22 p.m., just over an hour after Culbertson and long after police had been overwhelmed. After entering the building, Lattanzi walked a short distance before

---

[5] The government had recommended 14 days of incarceration.

encountering a police officer, who stopped him and directed him to leave the building. Unlike Culbertson, Lattanzi instantly complied: he turned around and went back the way he had come, exiting the Capitol through the Senate Wing Door just five minutes after he had entered. When FBI agents approached Lattanzi three months later, he admitted to being in Washington, D.C. on January 6, 2021, but falsely denied having entered the Capitol building. The next day, an attorney representing Lattanzi contacted the FBI and informed the agents that Lattanzi wished to amend his statement. Unlike Culbertson, Lattanzi then came clean. He admitted to entering the U.S. Capitol building and noticing that the window of the Senate Wing Door was broken at the time. Lattanzi also acknowledged that the flag he was holding during the riot had become stained with blood and mace. Lattanzi's case is generally on par with Culbertson's. While his conduct on January 6, 2021 was less culpable than Culbertson's—he entered far later, did not film or photograph, did not roam the building, left immediately after an officer verbally told him to do so, and spent only five minutes inside—Lattanzi brazenly lied about the most fundamental issue during his first FBI interview. Unlike Lattanzi, Culbertson has not amended his false statements to the FBI.

Leticia Ferreira's conduct at the U.S. Capitol on January 6, 2021 was worse than Lattanzi's, but Judge Chutkan imposed the same sentence in the two cases. On balance, Ferreira's case is comparable to Culbertson's as well.  Like Culbertson, Leticia Ferreira decided to follow the mob storming the U.S. Capitol building despite seeing police officers use tear gas and other serious techniques in an effort to control and repel the crowd. Like Culbertson, she entered the U.S. Capitol building through the Senate Wing Door within minutes after it was first breached, remained in the building for an extensive period of time (45 minutes), was not entirely truthful about her participation in the riot when interviewed by FBI agents, and did not express remorse during her voluntary interview with the FBI. The government acknowledges that *Ferreira* involved

aggravating factors that Culbertson's case does not—Ferreira followed on the heels of a group of rioters in the Crypt who forced their way through a line of USCP officers who were attempting to stop the advance of the crowd and denied observing violence despite the fact that she was captured on surveillance video filming physical conflict between rioters and police officers. Nevertheless, those aggravators are balanced by the fact that Ferreira exited the U.S. Capitol building of her own accord, unlike Culbertson, who was forced out by police.

Accordingly, the government recommends 36 months of probation with a special condition of 30 days of home detention, 50 hours of community service, $500 in restitution, and a $10 special assessment. Indeed, the Court imposed similar probationary sentences in two other comparable cases, *United States v. Susan Manwaring*, 1:22-cr-307 (CJN), and *United States v. Joshua Bustle*, 1:21-cr-238 (TFH).

Susan Manwaring and her adult son Landon, who was separately prosecuted, followed a similar path as did Culbertson. Like Culbertson, the Manwarings approached the Capitol building from the west, observing confrontations between the mob and police. And like Culbertson, the Manwarings worked their way through the crowd and followed other rioters up the exterior stairs leading to the Upper West Terrace. The Manwarings then entered the U.S. Capitol building through the Senate Wing Door at 2:23 p.m., just three minutes after Culbertson entered through the same door. Once inside the building, the Manwarings, like Culbertson, roamed to the Crypt, Statuary Hall, and the Rotunda, taking photographs and videos along the way. The Manwarings also breached a more sensitive area—the lobby of the Speaker's office suite, which is never open to the general public—that Culbertson did not access. In total, the Manwarings spent 25 minutes inside the Capitol building, 10 minutes fewer than Culbertson. Like Culbertson (and like Lattanzi and Ferreira), the Manwarings did not communicate on social media about January 6, spread

disinformation, or boast about their actions at the Capitol. Also like Culbertson, the Manwarings resolved their cases with immediate plea agreements. Ultimately, Judge Nichols sentenced Susan Manwaring to 36 months of probation with a condition of 30 days of home detention probation, and $500 in restitution.[6]

Similarly, in *United States v. Joshua Bustle*, 1:21-cr-238 (TFH), the defendant and his co-defendant wife, Jessica Bustle, unlawfully entered the U.S. Capitol on January 6, 2021, through damaged doors featuring broken windows while alarms blared. The Bustles then roamed the building for approximately 20 minutes while carrying signs protesting the government's efforts to vaccinate the population against COVID-19. Like Culbertson and the Manwarings, the Bustles fully cooperated with the FBI's investigation of them and rapidly resolved their cases with plea agreements. Judge Hogan sentenced Joshua Bustle to 24 months of probation with a condition of 30 days of home detention, and $500 in restitution. Meanwhile, Judge Hogan imposed a stiffer sentence against Jessica Bustle—24 months of probation with a condition of 60 days of home detention—because she, unlike Joshua Bustle, Susan Manwaring, or Culbertson, wrote a series of incendiary posts on Facebook before, during, and after the riot that spread misinformation, celebrated the crimes committed that day, and called for more violence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

---

[6] Although Landon Manwaring engaged in the same conduct as his mother on January 6, Judge Nichols imposed a stiffer sentence on him—30 days of incarceration followed by 35 months of probation. This was largely because between January 6, 2021 and his sentencing, Landon Manwaring committed another felony, for which he was separately prosecuted by state authorities. *See United States v. Landon Manwaring*, 1:22-cr-270 (CJN), ECF Nos. 19-20.

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Culbertson must pay $500 in restitution, which reflects in part the role Culbertson played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 14, 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, the U.S. Capitol Police, and MPD.) Culbertson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 79.

**VI.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Culbertson to 36 months of probation with a condition of 30 days of home detention, 50 hours of community service, $500 restitution, and the mandatory $10 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Culbertson's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:            */s/ Michael M. Gordon*
                         MICHAEL M. GORDON
                         Senior Trial Counsel, Capitol Siege Section

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Assistant United States Attorney, Detailee
Florida Bar No. 1026025
400 N. Tampa St., Suite 3200
Tampa, FL 33606
(813) 274-6370
michael.gordon3@usdoj.gov